## Maryland Assur. Corporation et al. v. Smith.

May 13, 1941.

514

Webb & Webb for appellants.

McDonald & Boaz for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

In July, 1938, the appellants issued to appellee an insurance policy which provided, among other things, for certain weekly indemnities for illness, which are the only features of the policy involved in this action. The maximum weekly benefit was $25 for total disability with a further provision that each consecutive full year's renewal of the policy shall add ten per cent to the indemnities until such additions shall amount to fifty per cent. The policy was renewed a sufficient number of years to add the fifty per cent addition, thus increasing the weekly indemnity for total disability to $37.50. The disability clauses of the policy read:

"Part 1. Total Disability. (1) If, during the term of this policy the Insured shall contract any disease or illness for which he shall be treated by a regularly qualified physician and which shall, beginning during said term, wholly disable and prevent

him from performing any and every kind of duty pertaining to his occupation, the Corporation will pay so long as the Insured lives and suffers such disability, the Weekly Indemnity hereinbefore specified.

"Intermediate Disability. (2) If the Insured shall be totally disabled as above and if immediately following the period of total disability, he shall by reason of any disease or illness, be disabled and prevented from performing a major portion of the daily duties pertaining to his occupation, the Corporation will pay for the period of such disability one-half (½) of the Weekly Indemnity payable for total disability.

"Partial Disability. (3) Or, if immediately following a period of total or intermediate disability the Insured shall, by reason of any disease, or illness, be prevented from performing a material portion of the daily duties pertaining to his occupation, the Corporation will pay for the period of such partial disability one-fourth (¼) of the Weekly Indemnity payable for total disability, it being understood and agreed, however, that the indemnity payable for intermediate and partial disability, singly or combined, shall not be payable in excess of fifty-two (52) consecutive weeks."

On November 26, 1938, appellee suffered a heart attack which he claimed totally disabled him and for which he made claim under clause One of the policy for $37.50 a week. The appellants paid the claim until May 9, 1939, and then refused to make further payments on the ground that appellee was not disabled from performing every kind of duty pertaining to his occupations stated in the policy, which were assistant cashier of a bank and tobacco manufacturer with superintending duties only.

In September, 1939, appellee filed this action seeking to recover of appellants under the total disability clause of the contract. Appellants answered denying that on November 26, 1938, or at any other time, appellee became or had been continuously since said time totally disabled by reason of such illness or disease to engage in his occupation as a tobacco dealed or manufacturer or to do or perform in a reasonable, practical way all material or other acts in the pursuit of his oc-

cupation. The answer put in issue the right of a recovery by the appellee on either of the disability clauses in the contract, total, intermediate, or partial disability. Before the trial of the action, which was in March, 1940, appellee amended his petition increasing the amount sought to be recovered to the sum of $1,687.50. A trial before a jury resulted in a verdict and judgment thereon in the sum sued for. Hence, this appeal.

Grounds urged for reversal of the case are, (1) that the court erred in submitting to the jury the issue of total disability (2) the court erred in giving to the jury instruction ''C'' defining total disability and not defining intermediate and partial disability, and (3) the instructions given were not in accordance with the contract between the parties. To determine the issues a review of the evidence becomes necessary.

Appellee testified that at the time of the issuance of the policy his business or occupation was that of assistant cashier of a bank and exporter of leaf tobacco. His hours a day at the bank were from 8:30 a. m. to 4 p. m., and his work consisted of general bank work such as receiving deposits, cashing checks, and bookkeeping; that while he was working on the books he was sitting down but when receiving deposits or cashing checks he was standing and was on his feet about half the time. His duties with reference to the tobacco business consisted of carrying on an export tobacco business, such as obtaining orders from abroad and shipping. He said, however, that he quit work in the bank about the end of the year 1918 and had devoted his time entirely to the tobacco business operated in the firm name of S. B. Smith and Company, a corporation of which he was the president. He purchased tobacco on the auction floors in practically all the dark fired leaf markets in western Kentucky, namely, Mayfield, Murray, Paducah, Clarksville, Springfield, and Hopkinsville. Prior to 1939 he did most of the buying himself and had buyers at other markets. In attending the tobacco sales and making purchases of tobacco at the various markets, he was required to stand on his feet from 8 a. m. to 4 p. m., and this continued four or five months of the year, and during the remaining seven or eight months of the year his duties consisted of handling contracts, arranging shipments, conducting negotiations for freight, etc. Prior to 1938 he made tobacco sales and shipments principally in

Spain but due to the war which started in Spain in 1936, his export business practically collapsed and he then formed a partnership with F. L. Nagel and continued in the purchase and sale of tobacco. His duties then consisted of the inspection of tobacco where it was stored in hogsheads and it was necessary to take a sample from each hogshead which had to be broken, and the performance of these duties required him to be on his feet practically all the time. He performed these duties up until November, 1938, when he had the heart attack resulting in his disability, and since that time he had not been active in inspecting or buying tobacco or otherwise performing his usual occupation in connection therewith.

Testifying concerning his disability, he said he suffered a heart attack while in New York City and immediately came home to the Mayfield, Kentucky, hospital, and was attended by Dr. Walters. He said he had not been active since he had the heart attack and had not purchased any tobacco or attended to the sampling and shipping of tobacco for his firm. He was also attended and treated by Dr. A. C. McCarty and Dr. Horine of Louisville, and Dr. Walters and Dr. Pryor, of Mayfield, had seen him once or twice a week since his affliction. He said the doctors prescribed medicine for him and he still continues to take the liquid medicine, a form of digitalis, three times a day before meals, and a capsule three times a day after meals.

Appellee further said that all the physicians who had treated or examined him advised him not to exert himself or to do anything that would be exciting and not engage in discussions or arguments or anything that would create emotion or excitement. They further advised him not to do any work and not to go on the floor or buy or sell tobacco, and to rest one hour each day after the noon meal. He said he had followed the doctors' advice since January, 1939.

Appellee admitted, however, on cross-examination that he went to the office when he was able, perhaps a few hours every day for several days, and then it would be two weeks before he was out again. He said that since his disability the business of the company had been handled by the Export-Import Bank, of Washington, and that there had been but little attention that he could give the business but he had given it some attention. It appears that appellee dictated a few letters, some of

which were personal and others having some connection with his business.

F. L. Nagel, appellee's business partner, testified that since appellee had the heart attack in 1938, he came to the office sometimes but had no regular hours; that when he was at the office he read the papers, talked socially, etc., but he did not have any supervision of the office. The evidence of a number of lay witnesses who testified for appellee corroborated appellee and Mr. Nagel.

In addition to the lay witnesses, four doctors testified for appellee. Dr. E. C. Walters testified, in substance, that he examined appellee soon after his return from New York in November, 1938, and he found that he was having trouble with his heart at that time and that he had seen him at regular intervals since then and that he is still suffering from organic heart trouble, angina pectoris, and had sclerosis on the left side ventricle, irregular heart rhythm, and that it is a very serious type of heart involvement; that he also had a condition of coronary thrombosis, and a swelling of the legs showing that the heart is not strong enough to pump the blood to the legs. The doctor expressed the opinion that appellee was disabled from doing any work and that his disability is total and permanent, and that he advised him not to do any work and appellee told him that he did not do any work. The witness was asked that if appellee went to his office and gave certain attention to his business, as indicated in the evidence of appellee and Mr. Nagel, if he, the witness, could be mistaken in his opinion that appellee was not able to work, and the witness answered:

"No, he isn't able to work, if you had a heart like Mr. Smith you wouldn't be here trying this law suit and I wouldn't be here either if I had a heart like him."

Dr. J. R. Pryor, a member of the staff of the Mayfield Hospital, testified that appellee had hardening of the arteries, skip in his heart beat, enlarged heart and swelling of the legs. He said that with a heart like Mr. Smith has he should not be able to do anything that required physical effort and that in his opinion he was totally and permanently disabled from engaging in the duties of his occupation as a tobacco dealer, or the duties of his former occupation as assistant cashier of a

bank, and that he had been so disabled since his heart attack in November, 1938. The doctor further expressed the opinion that appellee's condition would last as long as he lives. He further said that it was all right for appellee to go to his office if he desired to do so, but he should not concentrate or do any work that would require any physical effort or fatigue.

Dr. E. F. Horine gave testimony similar to that of the doctors mentioned above. After describing the condition of appellee's heart, which appears to be very serious, he said that appellee was totally disabled and that his disability is permanent. Dr. A. C. McCarty also examined appellee and found his condition to be that as described by the other doctors. In answer to a question outlining and describing the duties of appellee in the performance of his occupation, based upon the testimony of appellee and other lay witnesses who were familiar with appellee's duties in connection with his tobacco business and as assistant cashier of the bank, and as to whether or not appellee was disabled from engaging in those occupations and from doing and performing in a reasonable and practical way and manner, or a substantial way or manner, all the material acts of his occupation, the witness answered: "He certainly was so disabled."

"Q. Is this physical condition of Mr. Smith's, in your opinion as a physician, permanent and total, Doctor? A. It is."

Appellants insist that notwithstanding the opinion evidence of the doctors, the case should not have been submitted to the jury upon the issue of total disability, since appellee's own evidence shows that he did go to his office and performed certain duties in connection with his business.

The words "total disability" or "wholly disabled," as used in insurance contracts like and similar to the one here involved, have been defined by this court in numerous cases and should be too well known to the legal profession to require a repetition of the definition. It has been defined to mean such degree of disability as to prevent the insured from doing all the substantial acts required of him in his business, or, if the insured was prevented from transacting any substantial, material or important part of his business, or doing or performing

any substantial, material or important thing or duty customarily done or performed in his occupation, he is totally disabled. Columbia Casualty Co. v. McHargue, 246 Ky. 93, 54 S. W. (2d) 617, 619. In the case cited the court said:

> "A leading case is Doyle v. New Jersey Fidelity & Plate Glass Insurance Company, 168 Ky. 789, 182 S. W. 944, Ann. Cas. 1917D, 851. The view was expressed that recovery should not be denied because the insured was able to do minor and trivial things or to direct his business and do some work himself, or if his injuries were such that common prudence demanded that he desist from his labors and rest if it was reasonably necessary to effect a cure; but that it should be denied if he was able to do the things which constitute substantially all of his occupation, or if he was not disabled from doing all the substantial and material acts necessary to be done. Recovery was denied because the insured (a dentist) was in his office regularly and at times performed substantially all of his accustomed duties as set out in the opinion."

In the case at bar it is shown by the undisputed evidence that after appellee suffered the heart attack in November, 1938, he relinquished all the substantial duties of his occupation and did nothing more than visit the office occasionally, perhaps regularly a few days at a time and then was compelled to be absent for as long as two weeks at a time, and when he was at the office he did nothing more than dictate a few letters, and over a period of seventeen months' time he averaged about four letters a month, or one a week. There is no evidence tending to show that appellee performed anything like a substantial or material part of his duties in connection with the tobacco business or as a banker, as he did previous to November, 1938.

To support appellants' position a number of cases are cited, among which, and perhaps the strongest one, is the case of Mutual Life Insurance Company of New York v. Dause, 256 Ky. 448, 76 S. W. (2d) 233. It is insisted that the case at bar comes within the category of that case. It is our view, however, that the facts in that case are materially different from the ones in the present case. It appears that Dause had tuberculosis and took treatment or a rest cure for the same and

after his tubercular condition became apparently arrested he resumed his usual occupation and engaged in various positions of employment with different business concerns and earned good wages and a livelihood for himself and his family. A few years later he made application to an insurance company for reinstatement of his insurance policy which he had suffered to lapse, and stated in his application that he had had tuberculosis a few years previous but a complete recovery had been effected and that he was in good health. The insurance company rejected his application for reinstatement of the policy, not because it was thought he still had tuberculosis, but the fact that he had suffered an attack of that malady a few years previous. He then continued to work and was active and apparently in good health. However, after the economical depression set in about the year 1930, it appears that his earnings as an employee materially decreased or entirely ceased, and he then retired to his farm and became actively engaged in the occupation of farming, doing all the usual work incidental to that occupation. He then brought suit upon the lapsed policy, claiming that he was totally disabled and had been so disabled as a result of his tubercular condition. A doctor testified that he was of the opinion that Dause was totally disabled from performing the usual duties incident to the occupation of farming. We held that the mere opinion evidence of the doctor was insufficient to overcome the facts proven to the contrary even by Dause's own evidence. It is thus seen that the case at bar does not come within the category of that case and does not support appellants' position.

In reference to other cases cited and relied on for appellants, it is sufficient to say that upon examination of those cases we find that the facts involved therein are unlike the facts in the present case, since the contracts involved in some of those cases contain different language or phraseology, and in others the evidence is substantially different. We have reached the conclusion, therefore, that the evidence in the case at bar is amply sufficient to support the jury's finding that appellee is totally disabled within the meaning of clause one, or the total disability clause of the contract.

It is next insisted that since the court defined "wholly disabled," as used in part one of the policy, it should have also defined the terms "intermediate dis-

ability'' and ''partial disability'' as used in part two and three of the policy, respectively.

Since the term ''wholly disabled'' means that degree of disability which prevents a person from doing and performing in a reasonable and practical way all of the material acts or duties required of such persons in his regular business, occupation or employment, but does not mean absolute helplessness, a definition of the term was proper, lest the jury might construe it to mean absolute helplessness.

In fact, there are only two general classes or degrees of disability; one total or wholly, and the other partial. The former contemplates a disability which does not necessarily render the insured helpless, but which does incapacitate him from performing substantially all material duties of his business, profession or employment, in his usual and customary manner. The latter contemplates a disability which does not incapacitate the insured from performing *all* of such duties in such manner but only a *part* thereof.

Where the policy refers to the degree or general class of disability merely by its term, total or partial, the meaning of the term should be defined by the court in an instruction to the jury, but where the policy, without reference to its term, defines the words which will permit recovery it is sufficient for the court to instruct the jury in the words of the policy. Since the policy by its terms describes conditions which would permit recovery for varying degrees of partial disability, and the descriptive words were used in their ordinary sense and meaning it was unnecessary for the court to undertake to again define the meaning of the words descriptive of the condition.

The policy contract involved in the present case does not use the general term ''partial disability'' without any descriptive words, but divides what in reality is partial disability into two classes, the greater one denominated ''intermediate disability'' which the policy itself defines as being that degree or percentage of disability as will prevent the insured from performing a ''major portion'' of his daily duties pertaining to his occupation, and carries with it a compensation of one-half of the weekly indemnity or sum provided for total disability; and, the lesser one is denominated ''partial

disability" and is defined in the policy as meaning that degree of disability which will prevent the insured from performing a "material portion" of the daily duties pertaining to his occupation, and carries with it a weekly indemnity of one-fourth the sum allowed for total disability, or one-half the sum allowed for intermediate disability.

The court instructed the jury, in substance, to find for plaintiff the sum of $37.50 per week if they believed from the evidence that plaintiff was wholly disabled and prevented by disease from performing every kind of duty pertaining to his occupation, and defined the meaning of the term "wholly disabled." The court then gave the following instructions on the varying degrees of partial disability:

"(b) If the jury shall believe from the evidence that during any part of the time since November 26, 1938, the plaintiff was disabled as defined in paragraph (a) of this instruction, but immediately following a disability of that character, he was after May 9, 1939, by reason of disease, disabled and prevented from performing a major portion of, but not all of the daily duties pertaining to the occupation of an assistant bank cashier or Tobacco manufacturer with superintending duties only, then the jury shall find for the plaintiff in the sum of only $18.75 for each week after May 9, 1939, that the jury may believe from the evidence he was so disabled and prevented from performing only a major portion, but not all of his said daily duties;

"(c) If the jury shall believe from the evidence that during any part of the time since November 26, 1938, the plaintiff was disabled as defined in either paragraph (a) or paragraph (b) of this instruction, but immediately following any such disability, he was after May 9, 1939, by reason of disease, prevented from performing only a material portion of his daily duties pertaining to the occupation of an assistant bank cashier or tobacco manufacturer with superintending duties only, then the jury shall find for the plaintiff in the sum of only $9.38 for each week after May 9, 1939, that the jury may believe from the evidence he was so diabled and prevented from performing only a material portion of his said daily duties."

It is thus seen that the instructions, which are substantially in the language of the policy, described the conditions or degrees of disability covered by the "intermediate" and "partial" disability clauses of the policy.

Furthermore, in addition to the descriptive words of the conditions or degrees of disability which would permit recovery for the respective degree of disability less than total disability, the jury had the benefit of the sums recoverable, which further clearly indicated the extent or percentage of disability. It is to be noticed that under the "intermediate disability" clause covered by paragraph "b" of the instructions, the jury was told, in substance, to find for appellee the sum of $18.75 (one-half the sum allowed for total disability) if appellee's disability was such as to prevent him from performing a "major portion" of his daily duties pertaining to his occupation. No doubt the jury understood that the words "major portion" meant at least as much as one-half of all duties, or, at least one-half total disability. And, the same is true as to paragraph "c" of the instructions, which covered the "partial" disability clause of the policy which carried with it a recovery of $9.38, or one-fourth the sum allowed for "total" disability, or one-half the sum allowed for "intermediate" disability which would clearly indicate that the words "material portion" meant even less than "intermediate" disability. We think that the descriptive words used in the instructions, together with the sums recoverable under each clause, amounted to a definition of each degree of disability less than total.

Under the evidence and instructions given, the jury found that appellee was wholly disabled within the meaning of that term as defined by the court and found for appellee under the instruction covering paragraph One of the policy, which authorized a recovery of $37.50 per week under the total disability clause, rather than under either the "intermediate" or "partial" disability clauses covered by instructions "b" and "c". It follows, therefore, that the court did not err in failing to undertake to further define the terms "intermediate" and "partial" disability.

Finding no error prejudicial to the substantial rights of appellants, the judgment is affirmed.